TREAX Asset Management, LLC versus South Trion, LLC. Good morning, Your Honors. Peter Havilis on behalf of the Appellant TREAX Asset Management. Your Honors, I'd like to start with a few basic observations here. First, there is no case law that says indentures trump other agreements. You have to look at the agreements to make that decision. Did the district court here say indentures trump other agreements? No, I just start that as an observation. Why don't we start with an observation that's relevant to the case? Okay. The next observation, Your Honor, is that the district court focused on one and made its ruling based on one sentence in the agreement based exclusively on that, on the ground that that provision is specific and everything else is general and nothing else can be looked at in determining the manner in which . . . Doesn't everything else say that it's subject to more specific provisions? Actually, no, Your Honor, and that's the point that I want to get to in going through the text of the provisions. If you go through the textual analysis of each of the . . . It's in the first line of that subsection, right? The first line of that subsection says . . . 12.18A2i. That's the first line, right? You've got to start with three years. Your Honor, on this issue, we're not questioning whether or not there is an obligation to sell the question. I thought you said it's kind of in the middle of like boilerplate. It doesn't mean anything. No, no, no. My focus is on paragraph, subparagraph B, Your Honor, not subparagraph A, because Triax, unlike the note holders that withdrew their appeal, does not take the position that there is not an obligation to sell. The issue is may the collateral manager exercise its judgment in accordance with the standard of care set forth in Section 2A and the commercially reasonable in terms of the manner in which this is sold. We have never . . . Now, that's interesting because you do have this 12.1B says the collateral manager shall use commercially reasonable efforts to sell. Yes. Did they use commercially reasonable efforts to sell? Did they use any efforts to sell? Your Honor, the record that happened here is that in the summer of 2015, Triax began the process of getting ready to sell the securities it put out notice after being reached out by South Trion. Thereafter, other note holders complained that they should not sell because it would violate duties. Triax consulted with the trustee. There was going to then be discussions amongst all the note holders, and the trustee commenced this interpleader action. In the course . . . What we're here to decide is whether they . . . what their obligation was. The issue that we've raised on appeal, Your Honor, is whether the collateral manager may exercise its judgment in the best way to sell these securities. No. No. Your argument is they can use their commercially reasonable judgment to decide not to sell at all. No. That is not the position Triax takes in this appeal, Your Honor. We made that clear both before the district court and in our briefs. We did not say there's no duty to The collateral manager needs to be able to exercise its judgment to be able to, for instance, to make sure that the prices are not sold for an absurdly low value that's below its intrinsic value to be able to use reserve prices, be able to decide the timing and sequencing of how you put securities out for sale . . . Is that going longer than the three years, then? It would involve . . . Is that your interpretation of the indenture? Before . . . Your Honor, our interpretation is that after the three years, where the collateral manager must sell it, the collateral manager should be given the discretion to determine the best way to achieve its duties that are specifically . . . Which means it's going beyond the three-year period that . . . Yes, Your Honor. Absolutely. We're talking about after the three-year period because before the three-year period, it's discretionary. It does not have to sell anything before the three-year period if it chooses not to. So we are, for sure, talking about the post-three-year period, Your Honor. But you're also saying it's discretionary beyond the three-year period because there are certain factors that limit that discretion, but it can be exercised beyond the three-year period. Yes. That's the point, right? Yes, and that's because of the ambiguity created by the provisions. Here's the problem with the analysis that we have by the district court about this being specific and trumping the others. If you start with Section 2A in the collateral management agreement, which is 390 of the appendix, it specifically incorporates language that says that this section applies to the sale of securities under Article 12. Article 12 is where Section 12.1 appears, and in that section, it then provides a very specific duty of care. Section 2B of the collateral management agreement specifically then goes on to say that all the performance of the obligations under the operating agreements, which includes both the collateral management agreement and the indenture, is subject to the duty of care in Section 2A. That duty of care imposes a much greater standard on the collateral manager than what the district court said. The district court basically accepts the notion that the word commercially reasonable in 12.1B means choosing what day of the week you can sell it on. And beyond that, there's no judgment that can be exercised. And the reality is, if that provision stood in isolation, that might be the only interpretation of the agreement. But here, there is ambiguity because 2A specifically says it applies to Article 12 and the sale of securities. 2B says you have to apply, you have to comply with the standard of care. And when the district court quoted 2B in making its analysis, as does the self-triumph, when it talks about it, it drops the first romanet from that clause in 2B, which says the standard of care set forth in Section 2A. Our point here is, Your Honor, there is ambiguities because these agreements clash in terms of what is the extent of the commercially reasonable judgment and the standard of care to protect all note holders, that's the collateral managers to exercise in selling these securities. For instance, under the district court's analysis, if I had three bids that came in and offered, using the pricing for bonds of zero to 100, five, when there is an intrinsic value of 60 or 70, and five was the highest bid, I would have to sell that, even though that wipes out and destroys the interests of all the consistent with the standard of care that nationally recognized collateral managers. Is that the issue really in this case? I thought the issue in this case was that the collateral manager, what you're asking the collateral manager to do is to make a judgment as to whether the actual market value is not a good time to sell. We should sell some other time. No. The principal issue we raised before the district court was the ability to use reserve prices to make sure that we weren't selling to people who were coming in and bidding below the intrinsic value of the securities. The district court said we couldn't do that, just sell the securities. It came down to how we exercise our care. The problem is, I will not argue with how you construe the one sentence in subparagraph B, but that's not the issue. The issue is when you read these two agreements together, as you must, because they are integrated, there are places littered through both agreements that make these one integrated document, they were signed the same time. Can you say that now a reading of one sentence in subparagraph B can be reconciled with language to the contrary in sections 2A and 2B? It's an ambiguity. When they actually did sell pursuant to the court's order, is there any reason to think that they got a ridiculous price because of some collusion among the bidders? How do you determine what the actual intrinsic value in the market is if nobody is going to bid? Your Honor, if there was collusion, they wouldn't be bona fide. The issue is not collusion here. What is the problem? The problem is, Your Honor, because these securities had substantial value embedded in them because of the settlements that had been agreed to but not yet publicly announced because it was still subject to confidentiality orders, the collateral manager was able to look at and value what the impact of those dollar values were to the securities in question. Just like you've seen after the fact with some of the rating agencies that have changed the ratings of some of these securities that have publicly now benefited from the securities, this information is not necessarily available to the market. They can't disclose it yet because it's subject to confidentiality orders, so they can do some intrinsic valuation. When these securities were sold in after the order, and as we point out in our brief, it's to horse the record, but the collateral manager believed that they were selling it for probably 10 or 15 basis points below what the intrinsic value was in forfeiting the litigation recoveries that went with those securities because they stayed with the securities. They weren't partitioned off, and so whoever bought those securities were going to get the benefit of that litigation recovery. That was not, in the collateral manager's mind, after the fact, was not priced in it, but the order was not stayed by this Court. We had to sell. We couldn't take that into account, and that evidence has not been put before the district court or this Court, so I don't want to go beyond it. But that's the kind of argument as to what commercially reasonable efforts to sell would be? Under the context of sections 2A and 2B of the collateral management agreement, absolutely, Your Honor. And that's the problem. The issue here is not for us because the district court never reached the question of what is commercially reasonable like the appellate division did in the Good Hill case. Rather, the Court stopped and said, you know, the one sentence in subparagraph B, it did not . . . it refused to acknowledge that there was a contractual ambiguity. And the question here is not what's the right way to sell the securities today. That's an issue for the fact finder. The question is, is there an ambiguity in these contracts that prevented the district court from saying the one sentence in subparagraph B overrode because it was specific rather than general, despite the specific references in subparagraphs A and B of section 2 of the collateral management agreement that say it specifically applies to Article 12? Thank you. Thank you, Mr. Haviland. Yes. I have a short time for rebuttal, Your Honor. Mr. Pickard? May it please the Court. Jonathan Pickard from Quinn Emanuel, Urquhart & Sullivan, on behalf of the Appellee South Tryon LLC. Your Honors, the manager in this case, in fact, did not take any efforts, did not commercially reasonable or otherwise, to try to sell assets prior to them reaching their three-year anniversary under the . . . of being defaulted securities. And we agree that the issue here is whether the contract unambiguously requires that assets be sold within that three-year period. This is the fourth time that a court is considering the arguments that are being raised here. The court below, Judge Pauley, found the contract to be unambiguous in his summary judgment order. He denied a motion to stay pending appeal, and a three-judge panel of this court also denied a stay pending appeal as well. The district court correctly ruled that the architecture under this agreement is clear and unambiguous. Section 12.1 of the indenture includes two relevant provisions. 12.1a includes a number of sub-provisions that direct when securities may be sold and when securities shall be sold. 12.1a2 says that securities shall be sold when they are defaulted prior to their third-year anniversary of having become a defaulted security. It is clear and unambiguous. Even if it's not commercially reasonable at the time to sell within that three-year period? That's correct, Your Honor. It is notable that 12.1a2 contains no commercially reasonable portion to that provision. It says unambiguously that they shall be sold within three years. So what's the purpose of the three-year limitation then? The purpose of the three-year limitation is that this transaction was originally created to hold highly rated prime RMBS. It was not set up as a transaction that was supposed to be investing in distressed securities. So when securities become distressed through a number of different ways that they can be considered a defaulted security, in order to protect the senior investors in the transaction, my clients are senior investors, it requires that the manager not hold on to those securities, thus turning this into a distressed investment, but has a period of time in which they must be sold. And the district court properly found that that was a protection for the senior investors in this structure. Now section 12.1b then sets forth when 12.1a says securities must be sold, how they must be sold. And it says that in that section that the manager shall use commercially reasonable efforts to sell pursuant to very precise procedures. What can you tell us about the sale of the 49 defaulted securities last fall? Your Honor, after the stay was denied, the securities were sold pursuant to market standard procedures consistent with how they are laid out in the indenture. In fact, there was a bid list that was put out for those securities. They were shopped out to at least three approved dealers, so they went out to a broad enough marketplace. There was at least, I believe, five days given for potential bidders to consider a purchase. There's litigation, though, about the underlying mortgages and the underwriting standards, whether they were applied or not. This is part of what happened in 2008, right? That is correct, Your Honor. So what is the result of the ongoing litigation over those underwriting standards not being applied to the tranches that were involved here on the sale of the 49 securities? Your Honor, some of those litigations have actually been dismissed, and the litigations that are out there are known. They are known by sophisticated investors in this marketplace. As Your Honors are all certainly aware, there has been a lot of litigation over RMBS securities. The notion that there is some intrinsic value that takes into account litigation recoveries that bidders in the marketplace don't know about is simply a fallacy. There certainly is nothing in this record to suggest that bidders in this marketplace would not be able to properly take into account what the potential value is of litigation recoveries. On top of that, that's not— Can it flow to the purchaser of the securities? That's correct, Your Honor. If they are going to bid on the RMBS when they are auctioned, they will take into account what the anticipated cash flows are in that security, and if they are going to be a beneficiary of litigation recoveries, they can take that into account as well in making their bid. And no one has raised a complaint subsequent to these 49 assets being sold that somehow an unfair price was obtained. In fact, this is how it works every day. These CDO structures exist, and there are provisions under the CDO structures where assets get sold out of the portfolio. When they are sold, they get sold pursuant to an auction process. The indentures include certain terms related to what must be done in that auction process, and then there are other aspects of the auction process that are left to the discretion of the manager to exercise their standards of care as set forth in the collateral management agreement, like here, as well as the expectation that they would be commercially reasonable. One example is you would certainly not expect it to be commercially reasonable that the manager would set one of these sales to occur on Christmas Day. The contract doesn't say that, but that would be the type of application where they couldn't do that because that would not be commercially reasonable. But there is nothing to suggest here that the commercially reasonable standard allows them to override the express and clear and unambiguous requirements that securities be sold within three years. Would it permit them to set a reserve price? A reason, whatever might, let's throw in the word, a reasonable reserve price? No, not in this case, Your Honor, because the indenture in 12.1b expressly provides that the issuer shall sell such defaulted security to the highest bidder. It sets it very clearly. And look, when investors, these are sophisticated which how defaulted securities will be handled, you know, if defaults occur. 12.1b says you should use commercially reasonable efforts, but it then sets out a fairly specific procedure for what's supposed to take place. That's exactly right, Your Honor. And what is being argued here is that if you have a commercially reasonable standard in a contract, that that essentially provides the contracting party carte blanche to come in and say, well, I'm going to decide that it's not commercially reasonable, therefore I am not subject to the express strictures of the agreement. And that is exactly what the Court rejected in the Goodhill case. In that instance, that was a case where Deutsche Bank came in and argued that because they considered it to be commercially unreasonable, that they didn't have to perform certain calculations based upon a particular report. And the Court there called it leisure domain to argue that you can take one provision that says you have to act commercially reasonable and use that to override your clear and unambiguous and express obligations. I also would like to note, Your Honor, that the argument was made that Section 12, Section 2A of the Collateral Management Agreement expressly acknowledges that it applies to Section 12.1. What Section 2A actually says is that the collateral manager agrees, and this is on JA 390, it actually says the collateral manager agrees to direct the sale, termination, or assignment of collateral debt securities and equity securities in accordance with Article 12 of the indenture. It doesn't say, suggest you have some standard of care that gets to override those provisions. In fairness, down towards the bottom of that same section, it says the collateral manager shall perform its duties here under, which includes what you just referenced, selling under Article 12, and shall exercise reasonable care in a commercially reasonable manner consistent with practices and procedures followed by institutional managers. That is correct, Your Honor. But the provision also, and a sentence after that, says the collateral manager shall comply in all material respects with all of the terms and conditions of the indenture. So your argument is this is another one of those general provisions that says in general you have to act commercially reasonably in doing everything, but it's rather specific that you have to comply with the terms of the indenture. That's absolutely right, Your Honor. And certainly this Court's precedent in eremony and capital ventures and there are plenty of other cases that control here with respect to specific provisions governing general provisions. And there's no colorable argument here that this is not a more specific provision in the indenture when it talks about the sale of defaulted securities and when those sales must occur than the provisions in the collateral manager agreement that describe a general requirement to apply certain levels of standard of care in the collateral manager's duties overall. Unless Your Honors have any further questions, I'll wrap up there. Thank you, Mr. McCarty. Your Honors, let me make a number of quick points in my time for you. First, with respect to all of what we heard about and what investors knew and how this sale was conducted, there's no evidence that Self Trial never put in the record on this. The only evidence that's in the record is on pages 742 and 743 of the record from Mr. Calamari's affidavit in which he says the collateral manager consulted with other professionals, including the firm it hired to sell these securities, and they were told they should put in a reserve price. So that is consistent with the notion of the industry standard of care here. And that evidence was never rebutted. Everything you heard from Mr. Picard was his testimony that's not one place in the record. Secondly, getting now to Section 2A, Your Honor picked up on a portion of the language, but tellingly what Mr. Picard omitted when he quoted the first sentence of Section 2A of the Collateral Management Agreement on page 390 was the introductory clause that qualified the whole thing, which said, subject to and in accordance with the terms of the indenture and this agreement, it shall sell securities under Article 12. And then it goes on to talk about not subject to the indenture in the text that Judge Hall read, but it said subject to the operating agreements. And if you look at the top of page 390, operating agreements is defined to include both the Collateral Management Agreement and the indenture. The reality is, unlike in Arimony where the Court was looking at a recital up at the very beginning saying, whereas, where the Court said that's a general, vague, precatory statement of parties' wishes and intents, we're dealing with a specific operative contract provision. And the only issue on this appeal is are the terms that the Court has to wrestle with is not what was collaterally, commercially reasonable, but whether these terms are ambiguous as to what's the scope of the commercially reasonable judgment and the standard of care to be exercised by the collateral manager. It does say the collateral manager shall comply in all material respects with all of the terms and conditions of the indenture. Right. And it also talks in the duties and functions delegated hereunder. Right. And it also talks about the collateral manager shall perform its duties hereunder in accordance with the terms and conditions of the operative documents, which are both agreements. And that's the problem, Your Honor. These agreements were written in a way that creates a clash as to how broadly or narrowly you're going to have to construe commercially reasonable. Can that clash be resolved as a matter of law? The answer we respectfully submit is no, because the standard of care, which Mr. Calamari in his affidavit talks about what they did, consulting with other professionals, says, how's the best way to deal with this? And reserve prices is the best way. Let me just deal with the last point before my time expires. The settlements. Yes, everyone knows about settlements, but the amount, the dollar amount that's going to flow to the security until they are publicly announced is not known. And most of these settlements, as Mr. Calamari said in his affidavit, are still confidential and the numbers have not been disclosed. Only one settlement was publicly disclosed because it was after a hearing before the state Supreme Court under Article 77, and that was the Bank of America settlement. Everything else is subject to confidentiality agreements until the monies are distributed and publicly disclosed in accordance with the terms of confidentiality orders. That's why reserve prices, according to the professionals to which Triax referred, are within the exercise of judgment if you apply Section 2A. And that's why we have to say there's an ambiguity that has to be resolved by the trier of fact. Thank you, Your Honors. Thank you very much. Thank you both. Well-reserved decision.